## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 09 2019, 8:31 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency – Appellate Division

Lisa M. Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF
CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of J.L. (Minor Child) and

J.R. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

and

October 9, 2019

Court of Appeals Case No.
19A-JT-764

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Scott Stowers, Magistrate

Trial Court Cause No.
49D09-1806-JT-796

Child Advocates, Inc.,[1]
*Appellee-Guardian ad Litem.*

**Mathias, Judge.**

J.R.'s ("Mother") parental rights to her minor child were terminated in the Marion Superior Court. Mother appeals and raises two issues:

I.  Whether the trial court erred by denying Mother's motion to dismiss the petition to terminate her parental rights because the evidentiary hearings were not completed within the statutory 180-day time frame; and,

II.  Whether clear and convincing evidence supports the trial court's order terminating Mother's parental rights.

We affirm.

## Facts and Procedural History

J.L. was born on December 18, 2016. Shortly after her birth, on January 17, 2017, the Indiana Department of Child Services ("DCS") filed a petition alleging that J.L. was a Child In Need of Services ("CHINS"). Specifically, DCS alleged that Mother and R.L. ("Father") had not provided J.L. with a stable home and that Mother had untreated mental health issues.

---

[1] DeDe K. O'Connor filed an appearance on behalf of Child Advocates, Inc., but did not file a brief.

[3] At the initial hearing, J.L. was placed with Father in a temporary trial home visit. However, on March 2, 2017, she was removed from Father's care because DCS learned that he was leaving J.L. with random relatives. J.L. has been in foster care since that date.

[4] On April 28, 2017, Mother admitted that J.L. was a CHINS. After that date, Mother's participation in services was sporadic, and she failed to attend a family team meeting. On August 4, 2017, the trial court noted that Mother's home-based case management "had been closed because of lack of participation." Ex. Vol., Pet'r Ex. 12 p. 81. Mother was homeless, unemployed, and pregnant. Her relationship with Father was volatile, and Mother and Father were physically violent with one another. During supervised visitation, Mother's parenting skills improved slightly, but she acted impatient and agitated when trying to comfort J.L.

[5] Mother failed to appear for the September 8, 2017 dispositional hearing at which the trial court ordered her to participate in home-based therapy. Mother's participation was sporadic, and she refused assistance from her case worker. She failed to follow through with tasks and medical appointments on her own. Mother's anger made it difficult to provide services to her and she refused to take medications to address her mental health issues. At the permanency hearing held on June 8, 2018, Mother's home-based therapist reported that Mother's ability "to reason and make decisions that are beneficial to herself and her child" continued to be limited. Ex. Vol., Pet'r Ex. 18 p. 125.

[6] For these reasons, the trial court changed J.L.'s plan to adoption at that permanency hearing. Furthermore, the trial court noted that Mother had often requested a reduced visitation schedule. During visitation, she struggled to provide care for J.L. without assistance from her home-based therapist. Her frustration with J.L. was evident, and she screamed at J.L. when the child approached the therapist. *Id.* at 127. Mother also required prompts to feed J.L. and change her diapers.

[7] On June 28, 2018, the DCS filed a petition to terminate Mother's parental rights to J.L.[2] The termination hearing was held on January 17 and 24, 2018. One week before the January 17 hearing, Mother filed a motion to dismiss DCS's petition because the hearing was not held within the time limits established in Indiana Code section 31-35-2-6. At the termination haring, Mother renewed her motion to dismiss. After noting that Mother had previously waived the statutory time limits, the trial court denied her motion.

[8] Mother's home-based therapist, Dr. Robin Kohli, and the guardian ad litem testified at the hearing and agreed that two-year-old J.L. needed permanency best provided by her current foster family. The trial court terminated Mother's parental rights after finding that

> 8. On February 21, 2017, [Mother] underwent a Psychological Evaluation administered by Dr. Robin Kohli of Woodview Psychology Group.

---

[2] Father's parental rights to J.L. were terminated in a separate proceeding.

9. Dr. Kohli has been qualified as an expert in the area of Clinical Psychology.

10. During the psychological evaluation, [Mother] appeared to be experiencing hallucinations, as she demonstrated a flat and inappropriate affect such as laughing while discussing being raped.

11. [Mother] disclosed to Dr. Kohli that she has willingly participated in prostitution with at least five different men, beginning at age eighteen (18).

12. [Mother] also disclosed that she has been the victim of domestic violence at the hand of [Father], including at times while she was holding the child.

13. During the psychological evaluation, [Mother] made concerning statements regarding the child, including jealousy toward the baby as well as resentment toward [J.L.] for taking attention away from [Mother].

14. [Mother] also expressed to Dr. Kohli that [J.L.] was "annoying because all she do is cry, cry, cry" and that compared to other babies, [J.L.] is "more annoying than most other babies."

15. At the time of the psychological evaluation in February 2017, [Mother] insisted that she didn't need treatment or parenting classes.

16. Dr. Kohli diagnosed [Mother] with Unspecified Schizophrenia and Other Psychotic Disorder; Posttraumatic Stress Disorder, and Child Neglect.

17. Dr. Kohli concluded that [Mother] is at a high risk for engaging in physical child abuse.

18. [Mother] also expressed to Dr. Kohli desires of revenge to "get back at" [J.L.].

19. Dr. Kohli concluded that [Mother's] prognosis for meaningful improvement is poor.

20. Dr. Kohli found no evidence of attachement [sic] between [Mother] and the child.

21. Dr. Kohli strongly recommends that [Mother] receive a psychiatric consultation to determine appropriate psychotripic [sic] medication to alleviate her symptoms.

22. As of the January 24, 2019 trial date, [Mother] had been residing in a shelter for approximately one week. For much of the duration of the CHINS case, she was homeless and other than residing in an apartment for part of 2017 and 2018, she has not had stable housing.

23. As recently as the January 17, 2019 trial, [Mother] still did not have an understanding as to why DCS is involved with her child.

24. When she did reside in the apartment, she was unable to pay her electric bill so her power was shut off.

25. [Mother] did get medications prescribed. However, she did not consistently take them because she didn't like the side effects.

26. Since [J.L.] was born in December 2016, [Mother] has had two other children.

27. Nicki Rogers of Branches of Life provided Home Based Therapy; Home Based Case Management; and Supervised Parenting Time for [Mother] since February 2017.

28. [Mother] initially was slow to engage with Ms. Rogers.

29. [Mother] did make progress with managing her anger.

30. [Mother] still struggles with comprehension and has difficulty retaining information.

31. [Mother] made some progress with her therapeutic goals of improving her thought process and patterns. However, there is still lots of work to be done. [Mother] is not receptive to help and demonstrates lots of opposition and confrontation.

32. Ms. Rogers established goals for [Mother] in Home Based Case Work of Housing and Prenatal care.

33. Ms. Rogers took [Mother] to several doctor's appointments.

34. [Mother] did obtain an apartment in the summer of 2017. The conditions deteriorated and [Mother] moved out in May 2018.

35. [Mother] struggled with maintaining a budget as well as distinguishing between "needs and wants."

36. After moving out of the apartment in May 2018, [Mother] lived in several different places including the streets.

37. [Mother's] parenting time with the child since March 2017 have been "supervised therapeutic visits."

38. [Mother] receives one visit per week with the child. Prior to July 2018, she received two sessions per week. After her parenting time sessions were reduced from two per week to one, [Mother] became more consistent.

39. During parenting time sessions, [Mother] has demonstrated negative behaviors including yelling and cussing at [Father] on the telephone.

40. [Mother] has also made negative comments about [J.L.] during parenting time sessions and demonstrates a lack of empathy.

41. Although [Mother] made progress with simple tasks such as making a bottle for the child, she is nowhere near progressing to unsupervised parenting time.

42. In May 2018, [Mother] contacted Karina Napier of Midtown Mental Health to set up an appointment for the following day.

43. [Mother] failed to appear and later made four other appointments and failed to appear for all of them.

44. Following the fifth missed appointment, Ms. Napier closed out unsuccessfully.

45. The child has been removed from her mother's care and custody for at least six (6) months under a dispositional decree prior to this Termination Action being filed on June 28, 2018.

46. The child has been placed in Foster Care since March 2017. She is doing well and her needs are being met. She is placed with her biological siblings. This is the only home she has known. This is a pre-adoptive placement.

47. [Mother] has expressed to the FCM a desire to receive Mental Health Treatment on her home [sic] at Midtown. However, she never followed through.

Appellant's App. pp. 99–101.

[9] The trial court concluded 1) that there is a reasonable probability that the conditions that resulted in the child's removal and continued placement outside of the home will not be remedied, and 2) that continuation of the parent-child relationship poses a threat to the child's well-being. The trial court also concluded that termination of Mother's parental rights was in J.L.'s best interests because Mother "has not demonstrated the ability to appropriately care for" J.L. *Id.* at 101. Mother now appeals.

## I. Statutory Time Limits

[10] Mother argues that the trial court erred by denying her motion to dismiss the DCS's petition to terminate her parental rights because the termination hearing was not commenced within 90 days after the petition was filed and was not completed within 180 days of the filing of the petition.

[11] The statute governing the time limits for hearings on termination petitions provides:

> (a) Except when a hearing is required after June 30, 1999, under section 4.5 of this chapter,[3] the person filing the petition shall request the court to set the petition for a hearing. Whenever a hearing is requested under this chapter, the court **shall**:
>
>> (1) commence a hearing on the petition not more than ninety (90) days after a petition is filed under this chapter; and
>>
>> (2) complete a hearing on the petition not more than one hundred eighty (180) days after a petition is filed under this chapter.
>
> (b) If a hearing is not held within the time set forth in subsection (a), upon filing a motion with the court by a party, the court **shall** dismiss the petition to terminate the parent-child relationship without prejudice.

Ind. Code § 31-35-2-6 (emphases added).

---

[3] Neither party contends that this subsection is applicable here.

[12] Here, the termination hearing commenced 203 days after the petition was filed and was completed 210 days after the petition was filed. Mother therefore argues that the trial court violated the plain language of subsection (a)(1) and (a)(2) of Indiana Code section 31-35-2-6, and that subsection (b) required the trial court to dismiss the petition.

[13] Mother's argument overlooks the fact that she affirmatively waived the statutory time limits, and therefore, she also did not object to the setting of the fact-finding hearing outside the ninety and 180-day time limits set forth in Indiana Code section 31-35-2-6. For this reason, the State contends that Mother waived any objection to the delay in the hearings.

[14] This court addressed a similar situation in *In re N.C.*, 83 N.E.3d 1265 (Ind. Ct. App. 2017). In that case, DCS filed a petition to terminate the parental rights of the father of N.C. The hearing on the termination petition was not commenced within ninety days of the filing of the petition, nor was it completed within 180 days after the filing of the petition. Instead, it was conducted 222 days after the filing of the petition.

[15] On appeal, the father argued that the trial court should have dismissed the petition when he orally moved to dismiss at the start of the evidentiary hearing. The *N.C.* court disagreed, holding that the father had waived any argument that the hearings were held beyond the statutory deadlines. *Id.* at 1267. The *N.C.* court held that the father had acquiesced to the hearing date, writing:

At a hearing conducted on December 9, 2016, [N.C.]'s Mother requested a continuance and a discussion ensued as to available court dates. The court reporter suggested March 21, 2017, and Father's counsel responded: "That sounds good." Father's counsel then inquired about the specific length of the fact-finding hearing, whether all day or one-half day. In general, "waiver" connotes an "intentional relinquishment or abandonment of a known right." *Plank v. Cmty. Hospitals of Ind., Inc.*, 981 N.E.2d 49, 53 (Ind. 2013). We agree with the DCS that Father waived his right to challenge the setting of that factfinding hearing date, although it fell outside the statutory 180 days. As such, Father can be afforded no relief in this appeal.

*Id.* (record citations omitted).

[16] The same is true here. On June 28, 2018, DCS filed its petition to terminate Mother's parental rights. Importantly, approximately forty-five days later, Mother, by counsel, waived the 180-day time requirement. Appellant's App. pp. 11, 54. *See id*. Relying on Mother's waiver, the trial court set trial dates for January 17 and 24, 2019, both beyond the statutory time limits. Mother did not object to the setting of the trial outside the statutory time limits. Mother eventually filed a motion to dismiss on January 10, 2019, after the 180-day time limit had passed. She renewed her motion at the January 17, 2019 termination hearing, and the trial court denied the motion.[4]

---

[4] The trial court had also previously denied DCS's motion to move up the trial date to comply with the time limits established in Indiana Code section 31-35-2-6 because the parties waived the statutory time limits. Appellant's App. p. 65.

[17]     Mother argues that we should follow a line of cases interpreting a similar statutory time limits for fact-finding hearings in CHINS cases. The relevant CHINS statute provides in part:

> (a) Except as provided in subsection (b), unless the allegations of a petition have been admitted, the juvenile court **shall** complete a factfinding hearing not more than sixty (60) days after a petition alleging that a child is a child in need of services is filed in accordance with IC 31-34-9.
>
> (b) The juvenile court may extend the time to complete a factfinding hearing, as described in subsection (a), for an additional sixty (60) days if all parties in the action consent to the additional time.
>
> * * *
>
> (d) If the factfinding hearing is not held within the time set forth in subsection (a) or (b), upon a motion with the court, the court **shall** dismiss the case without prejudice.

Ind. Code § 31-34-11-1 (emphases added).

[18]     Prior to 2012, subsection (d) was not yet part of this statute. *See In re J.R.*, 98 N.E.3d 652, 655 (Ind. Ct. App. 2018). Before this subsection was added, we had held that the use of the word "shall" in subsection (a) of this statute was "directory and not mandatory." *Parmeter v. Cass Cty. Dep't of Child Servs.*, 878 N.E.2d 444, 448 (Ind. Ct. App. 2007). "Our holding [in *Parmeter*] was based on the principle that 'the term "shall" is directory when the statute fails to specify adverse consequences, the provision does not go to the essence of the statutory purpose, and a mandatory construction would thwart the legislative purpose.'"

*J.R.,* 98 N.E.3d at 654 (quoting *Parmeter*, 878 N.E.2d at 448). Prior to the addition of subsection (d), Indiana Code section 31-34-11-1 contained no specific consequence for failure to hold the fact-finding hearing within the statutory time frame. *See id.* at 654–55. The *Parmeter* court therefore concluded that a mandatory construction would thwart the legislative purposes of the CHINS statutes to assist parents to fulfill their parental obligations and remove children only when in their best interests "by requiring dismissal of CHINS cases where continuances of the fact-finding or dispositional hearings are needed for legitimate reasons, such as the unavailability of parties or witnesses or the congestion of the court calendar, merely because one party is being a stalwart." 878 N.E.2d at 448.

[19] After the addition of subsection (d) in 2012, we reached a different conclusion under similar circumstances. In *J.R.*, a CHINS petition was filed on September 29, 2016. The trial court began a fact-finding hearing on November 22, 2016, within the sixty-day deadline. On November 29, 2016 (the day after the sixty-day deadline expired), the trial court ordered that the hearing be completed on February 6, 2017—130 days after the CHINS petition was filed. The parents subsequently objected to the trial court continuing the hearing outside the sixty-day limit imposed by Indiana Code section 31-34-11-1, but the trial court overruled their objection. The parents then filed a motion to dismiss the CHINS petition. The trial court denied the motion and ultimately adjudicated the parents' children to be CHINS.

[20] On appeal, the parents argued that the trial court erred by denying their motion to dismiss. We acknowledged the holding of *Parmeter* but noted that, since that case, section 31-34-11-1 had been amended to add subsection (d), which provides that upon motion, the trial court "shall dismiss the case without prejudice" "[i]f the factfinding hearing is not held within the time set forth in subsection (a) or (b)." The *J.R.* court therefore concluded:

> Subsection (d) cures one of the ambiguities of the statute (as identified by *Parmeter*) by spelling out the adverse consequence for failing to complete a factfinding hearing within the sixty-day period. . . . [T]he 2012 revision leaves very little room for doubt regarding legislative intent. Rather than changing "shall" to "may" or adding provisions allowing for continuances for good cause, the General Assembly instead added subsection (d). Simply put, there is no longer any reason to believe that the General Assembly intends Indiana Code section 31-34-11-1 to mean anything other than what its clear language indicates, i.e., that a factfinding hearing shall be completed within sixty days of the filing of a CHINS petition and that failure to do so is grounds for dismissal. *Parmeter* is no longer good law on this point, and we conclude that the juvenile court erred in denying [the] [p]arents' motion to dismiss.

98 N.E.3d at 655.

[21] We conclude that *J.R.* is readily distinguishable from the present case. The *J.R.* court was construing a CHINS statute, not the termination statute at issue here. Moreover, the parents in *J.R.* clearly objected to the trial court's continuance of the hearing outside the sixty-day time limit of the applicable statute. Here, as

previously noted, Mother not only failed to object, but specifically acquiesced to the delay in the termination hearings.

[22] Mother also cites *In re T.T.*, 110 N.E.3d 441 (Ind. Ct. App. 2018), in support of her argument that the time limit is absolute and cannot be waived. In that case, a CHINS petition had been filed on August 17, 2017. The trial court commenced the fact-finding hearing on October 6, 2017, within the sixty-day time limit. The parties then consented to an additional sixty days to complete the hearing pursuant to section 31-34-11-1(b). The hearing was then continued to November 7, 2017, a date within the new 120-day time limit. However, on November 7, DCS requested a continuance, and the trial court rescheduled the hearing for January 3, 2018—139 days after the filing of the CHINS petition. At the start of the January 3 hearing, the mother moved to dismiss the proceedings on grounds that the hearing had not been completed within the statutorily mandated time limit. The trial court denied the motion and adjudicated the mother's children to be CHINS.

[23] On appeal, the mother argued that the trial court had erred by denying her motion to dismiss. DCS claimed that dismissal was not required because Indiana Code section 31-34-11-1 did not create a hard and fast deadline and because the mother waived her objection by agreeing to the continuance. The *T.T.* court rejected DCS's first argument, concluding that "the General Assembly clearly intends for the timeframe set forth in Indiana Code section 31-34-11-1 to be a certain deadline." *Id.* at 443. With regard to the waiver argument, the court concluded:

while subsection (a) provides that the parties may waive the initial 60-day deadline by agreeing to a continuance, subsection (b) does not include any such provision. This lack of allowance for an additional extension of time indicates that the General Assembly intends to require that a factfinding hearing must be completed within 120 days of the filing of a CHINS petition **regardless of any act or agreements of the parties**. To allow the parties to agree to dates beyond the maximum 120-day limit would thwart the legislative purpose of timely rehabilitation and reunification of families that are subject to CHINS proceedings.

*Id.* (emphasis added).[5]

[24]    Mother argues that we should apply the reasoning of *T.T.* to the facts of the present case and hold that the statutory time limits for termination hearings are absolute and cannot be waived by the parties. We decline to do so. The aforementioned cases dealt with the time limits set forth in Indiana Code section 31-34-11-1 for CHINS fact-finding hearings. In contrast, here, we are concerned with the time limits for termination hearings set forth in Indiana Code section 31-35-2-6. Cases interpreting the former statute do not control in cases, such as the present one, involving the latter statute.

[25]    More importantly, Mother not only failed to object to the setting of the hearing outside the statutory timeframe, she affirmatively waived the deadline. *See* Appellant's App. pp. 11, 54. Accordingly, she failed to preserve any claim of

---

[5] Mother also relies on *In re M.S.*, 124 N.E.3d 1234 (Ind. Ct. App. 2019), *trans. granted*, in which our court held that the trial court erred in denying mother's motion to dismiss even though it was mother who requested the continuance that resulted in the hearing being set beyond the 120-day time limit. Transfer was granted in that case on September 12, 2019.

error. *See N.C.*, 83 N.E.3d at 1267. To permit Mother, after having affirmatively waived the 180-day deadline, to seek dismissal based on the trial court's failure to complete the hearing within 180 days would effectively allow her to "sandbag" the trial court. This would allow any parent to take advantage of invited error. *See Prime Mortgage USA, Inc. v. Nichols*, 885 N.E.2d 628, 657 (Ind. Ct. App. 2008) (noting that the doctrine of invited error precludes a party from taking advantage of an error that he or she commits, invites, or which is the natural consequence of his or her own neglect or misconduct).

[26] Although we do not suggest that Mother engaged in such "sandbagging" here, the result is the same: she waived the statutory deadline, then sought dismissal after the court acted on her waiver. Under such circumstances, Mother cannot complain that the hearing was held outside the statutory timeframe. Nor has Mother identified any actual prejudice to her ability to present her case as a result of the delay. Accordingly, we hold that the trial court's failure to hold and complete the evidentiary hearings on the termination petitions within the statutory timeframe did not constitute reversible error.

## II. *Sufficiency of the Evidence*

[27] Mother also claims that DCS failed to present sufficient evidence to support the trial court's decision to terminate her parental rights to J.L. The controlling statute provides that a petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for

placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[6]

[28] DCS must prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009). Because Indiana Code section 4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). Clear and convincing evidence need not establish that the continued custody of the parent is wholly inadequate for the child's very survival. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005). It is instead sufficient to show by clear and convincing evidence that the child's emotional and physical development are put at risk by the parent's custody. *Id*. If the court finds the

---

[6] Mother does not challenge the trial court's conclusion termination was in J.L.'s best interests, nor does she challenge the trial court's conclusion that DCS met its burden under subsection (D), regarding the plan for the care and treatment of J.L.

allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[29] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility, and we consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *J.M. v. Marion Cty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

[30] We have also often noted that the purpose of terminating parental rights is not to punish parents but to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for their termination when clear and convincing evidence establishes that they are unable or unwilling to meet their responsibilities as parents. *Id.* Thus, parental interests must be subordinated to the children's interests in determining the proper disposition of a petition to terminate parental rights. *G.Y.*, 904 N.E.2d at 1259.

[31] Mother contends that the trial court clearly erred by concluding that there was a reasonable probability that the conditions that resulted J.L.'s removal from her

care, or the reasons for placement outside her home, would not be remedied. When deciding whether there is a reasonable probability that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the trial court must determine a parent's fitness to care for the child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156–57 (Ind. Ct. App. 2013), *trans. denied*. The trial court may disregard efforts made only shortly before termination and give more weight to a parent's history of conduct prior to those efforts. *In re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013).

[32] Mother argues that the trial court placed too much emphasis on Dr. Kohli's report because she was evaluated by the doctor in February 2017. Mother also argues that she progressed in therapy and with home-based counseling, and that she no longer has a relationship with Father. In addition, Mother claims that the trial court's finding that she failed to recognize the need for mental health treatment and did not understand why DCS was involved with her child is not supported by the evidence. Mother admits that she has a history of cognitive limits, ADHD, PTSD, depression, and anxiety, but contends there is nothing in her history suggesting she suffers from psychosis other than Dr. Kohli's finding. Finally, Mother claims that she was unable to take her prescribed medication

because she was pregnant for eighteen of the twenty-four months that the CHINS and termination proceedings were pending.[7]

[33] Mother made marginal progress with J.L. and in home-based therapy. But her therapist testified that Mother still struggles with comprehension during therapy and could not apply the skills learned to her daily life. Tr. p. 100. And she could not remember what she learned from one session to the next. For example, Rogers testified that Mother understands "what abuse is and depending on her mood and her status in that relationship, she will either reject or accept that that relationship is an unhealthy one for her and for her children. It just depends on the day." Tr. p. 101. Rogers believes that Mother will have to continue to "work really hard to change behaviors and change her thought process" and there is "still a lot of work that needs to be done." *Id*. Mother also generally denied that she had "issues or problems" and insisted that she did not need help. *Id*. at 102. Rogers was also concerned about Mother's "lack of follow through with mental treatment and following recommendations of her" doctor. Tr. p. 118.

[34] Mother was unable to manage money and failed to maintain stable housing. Rogers testified that Mother's "understanding of … needs versus wants in regards to budgeting is … a huge barrier" to her ability to maintain stable

---

[7] Rogers testified that Mother refused to take her prescribed medication because Father told her she should not take the medication due to the side effects. Tr. p. 116; *see also* Tr. p. 160.

housing. Tr. pp. 105–06. On the date of the termination hearing, Mother had been living at a Salvation Army shelter for approximately one week.

[35]    Throughout the CHINS and termination proceedings, Mother was only able to consistently attend one supervised visit per week with J.L. Mother also cannot independently care for J.L. Mother does not understand "the needs of a child and child development as far as . . . how to provide appropriate and adequate safe care for a child[.]" Tr. p. 118. Because Mother was unable to care for J.L.'s basic needs, visitation never progressed beyond therapeutic visitation. Tr. pp. 114–15. Although Mother eventually established a bond with J.L., during visits, Mother would refuse to speak to or play with J.L. on a "fairly regular basis." Tr. pp. 112, 125.

[36]    Finally, we do not agree with Mother's claim that the trial court placed too much emphasis on Dr. Kohli's testimony and report. Dr. Kohli is a clinical psychologist with eighteen years of experience. Without objection, the trial court certified her as an expert in the area of clinical psychology. Tr. p. 13. Dr. Kohli evaluated Mother during the CHINS proceedings, approximately two years before the hearing was held in this case. It was within the discretion of the fact-finder to weigh Mother's current demeanor and mental state against Dr. Kohli's findings from two years prior to the termination hearing. *In re D.B.*, 942 N.E.2d at 871. Moreover, from the evidence presented, it was reasonable for

the trial court to conclude that Mother has done little to address her mental health issues throughout the CHINS and termination proceedings.[8]

[37] For all of these reasons, we conclude that the trial court's determination that there was a reasonable probability that the conditions that resulted in J.L.'s removal from her care, or the reasons for placement outside her home, would not be remedied is supported by clear and convincing evidence.[9]

# Conclusion

[38] Mother has not established reversible error in the trial court's failure to hold and complete the evidentiary hearings on the termination petitions within the statutory timeframe. Furthermore, Mother only challenged the statutory findings required by Indiana Code section 31-35-2-4(b)(2). Because we conclude that clear and convincing evidence supports the trial court's finding under section 31-35-2-4(b)(2)(B)(i), we affirm the trial court's order terminating Mother's parental rights.

[39] Affirmed.

Robb, J., and Pyle, J., concur.

---

[8] Mother notes that Dr. Kohli was the only individual who testified that she suffers from psychosis, and there was no evidence from her home-based therapist or any other case workers that they had observed any evidence of psychosis. Even if the doctor's diagnosis was in error, the remaining evidence is more than sufficient to terminate Mother's parental rights to J.L.

[9] Mother also challenges the trial court's finding that that continuation of the parent-child relationship poses a threat to J.L.'s well-being. Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not address this argument. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015), *trans. denied*.